UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| BETZAIDA SANTIAGO *o/b/o* ORLANDO R. III, Plaintiff, | : : : : |
| v. | : : |
| KILOLO KIJAKAZI, ACTING COMMISSIONER OF SOCIAL SECURITY, Defendant. | : : : : : |

No. 3:20-CV-1419 (VLB)

**MEMORANDUM OF DECISION GRANTING CLAIMANT'S MOTION FOR ORDER REVERSING DECISION OF THE COMMISSIONER OR, IN THE ALTERNATIVE, MOTION FOR REMAND FOR A HEARING AND DENYING RESPONDENT'S <u>MOTION TO AFFIRM THE DECISION OF THE COMMISSIONER</u>**

This case is about a child's efforts to maintain the social security disability benefits he has had since he was less than a year old. At birth, Orlando R. III suffered from several complications, including Failure to Thrive, Laryngomalacia, and Gastro-esophageal Reflux Disease. He received a Tracheostomy and a Gastrostomy to facilitate breathing and feeding. Orlando qualified for and was awarded social security disability benefits during infancy after being diagnosed with several severe impairments. As he got older, he required frequent medical attention and hospitalization for chronic pain; chronic lung disease, including Asthma; continued feeding issues; Attention Deficit Hyper Disorder, adjustment disorder with depressed mood, and other behavioral maladies. In August 2016, the Commissioner of the Social Security Administration[1] ("Commissioner")

---

[1] Since the filing of this action, the Commissioner has changed from Andrew M. Saul to Acting Commissioner Kilolo Kijakazi. The Court therefore orders the case caption to reflect this change.

determined Orlando's medical condition had improved, determined he was no longer disabled, and terminated his disability benefits. Betzaida Santiago, Orlando's mother, contests the Commissioner's determination. For the reasons stated below, the Court REMANDS this case for further development of the record.

I. BACKGROUND

Below is a recitation of the record and the parties' stipulated Statement of Facts.

A. Orlando's Medical and Educational History

Orlando was born premature through an emergency Caesarian section on February 19, 2005. (Tr. 644.) He was quickly diagnosed with Failure to Thrive, Laryngomalacia, and Gastro-esophageal Reflux Disease ("GERD"). (Tr. 1508.) Orlando had to be resuscitated twice, received a blood transfusion, and was on life support for the first nine months of his life. (*See* Tr. 644, 1509.) Surgeons performed a Tracheostomy to facilitate breathing, which was not removed until he was 1.5 years old. (Tr. 1510.) He also received a Gastrostomy tube ("G-tube") to facilitate feeding. (*Id.*) Throughout Orlando's childhood, he suffered from chronic lung disease and chronic pain. (*See, e.g.*, Tr. 19, 693, 735.) Orlando has a history of Asthma for which he takes medication and which he struggles to control. (*See, e.g.*, Tr. 655, 670, 697.) He has been hospitalized repeatedly. (Tr. 53; *see generally* Tr. 627-2318 (medical records).)

As a young student, Orlando struggled in school. (Tr. 652.) He was put in New Haven's Special Education Program in September 2007 (age 2.5) due to "developmental delay." (Tr. 397.) In January 2009, when he was approximately

four years old, the school system evaluated Orlando, gave him an educational classification of Other Health Impairment – ADD/ADHD and instituted an Individualized Education Program ("IEP"). (Tr. 311, 397.) As part of his IEP, Orlando received occupational therapy, time extension on tests, and small group instruction with a special education teacher. (Tr. 377, 385.)

From ages nine through 11, Orlando steadily improved in school while on his IEP. (*See, e.g.,* Tr. 347-48.) In March 2016, Orlando received his IEP reevaluation where he performed at "meets grade level standards" for various reading, writing, math, and other related skills. (Tr. 290-96.) Orlando was noted to sometimes be argumentative, fail to follow rules, appear sad at school, complain about health-related concerns, have difficulty maintaining attention and adapting, and demonstrate poor organizational skills. (*Id.*) His occupational therapist recommended continued therapy. (Tr. 312.) Nonetheless, the Planning and Placement Team ("PPT") highlighted his average performance in the general classroom and recommended he be exited from special education. (*Id.*)

After exiting special education, Orlando struggled again. Orlando's mother sought behavioral health treatment from Fair Haven Community Clinic ("Fair Haven"), due to her observation that he had trouble with attention, concentration, and organization. (Tr. 651.) Fair Haven formally diagnosed Orlando with Attention Deficit Hyper Disorder ("ADHD") in September 2016. (Tr. 651-52.)

Also during 2016, Orlando continued to struggle with his physical health. For example, during Summer 2016 (prior to the termination of disability benefits), Orlando experienced difficulty eating, and as a result he had to replace solid foods

with using his G-tube and drinking six bottles of PediaSure. (Tr. 645.) But in March 2017, Orlando's G-tube was removed due to complaints about leakage. (Tr. 714.) Within a few months, Orlando was hospitalized and underwent surgery to repair damage caused by long term use of the G-tube. (Tr. 714.) He again was prescribed six bottles of PediaSure, including during July 2017. (Tr. 716.)

In February 2018, Orlando was diagnosed with adjustment disorder with depressed mood. (Tr. 665.) He complained about difficulty sleeping, an ongoing issue for most of his childhood. On April 24, 2019, Orlando was diagnosed with Obstructive Sleep Apnea. (Tr. 1508.) He must sleep with a BiPAP machine at night. (Tr. 1511.)

B. Orlando's Disability Benefits History

When Orlando was about four months old, his mother applied for him to receive social security disability benefits. The Commissioner granted Orlando disability benefits, finding he suffered from Congenital Stridor, GERD, Nissen & G-Tube, and Laryngomalacia. (Tr. 18-19.) He determined Orlando's impairments were severe and functionally equaled Listed Impairment 10, "a gastrostomy in a child that has not attained the age of 3." (Tr. 19.) Also relevant was the fact Orlando struggled to gain weight and remained well below the 3% percentile on growth charts. (*Id.*) For the majority of his early childhood, Orlando continued to receive disability benefits.

In 2016 when Orlando was 11 years old, the Commissioner reviewed Orlando's claim for significant medical improvement. His primary diagnosis was listed as Catastrophic Congenital Abnormalities or Disease and a secondary

diagnosis of ADD/ADHD. The DDS medical and mental consultants found that Orlando's need for a feeding tube and other impairments—including lung disease, feeding tube and ADD—only minimally affected his functioning. (Tr. 99.) On August 18, 2016, the Commissioner ceased Orlando's disability benefits effective October 31, 2016. (Tr. 82.) Ms. Santiago timely requested a hearing.

The Commissioner held a disability hearing on December 12, 2017. The Hearing Officer noted Ms. Santiago's description of Orlando's impairments: lung disease, feeding tube, and AD[H]D. (Tr. 99.) The Hearing Officer noted Orlando's grades were Math 69, Writing B, Reading C, Spanish D, Social Studies F, Science F, and Gym B-. (Tr. 98.) After holding a hearing, the Hearing Officer evaluated the record and determined Orlando's impairments continue to be severe but that they did not meet or medically equal any of the Listed Impairments. 20 C.F.R. § 416.924(a)(d).

To decide if Orlando's severe impairments were "functionally equal" to one or more of these Listed Impairments, the Hearing Officer evaluated the six domains and made the following findings: (a) "less than marked limitation" in the Acquiring and Using Information domain, because he is no longer in special education, enjoys reading, and has an average achievement test; (b) "marked" limitation in the Attending and Completing Tasks domain, because he is failing several subjects and struggles to complete tasks; (c) "no limitations" in the Interacting and Relating with Others domain, because he has friends, gets along with his mother and younger cousins, and is not aggressive; and (d) "no limitations" for Moving About and Manipulating Objects domain; (e) "no limitations" for Caring for Himself

domain, because he has good hygiene and adaptive skills; and (f) "less than marked" limitations in the Health and Physical Well-Being domain, because his Asthma is controlled, he participates in gym, and participates in physical therapy. (Tr. 100.)  The Hearing Officer upheld the denial on the grounds that Orlando did not have two or more "marked limitations." (*Id.*)

Ms. Santiago thereafter requested a hearing with an Administrative Law Judge.

### C. The ALJ's Hearing and Decision

The ALJ's first hearing took place on September 28, 2018, and Ms. Santiago appeared on behalf of her son. (Tr. 66, 128.) The ALJ informed Ms. Santiago she had a right to be represented by an attorney or representative. *Id.* Because Ms. Santiago appeared for her son *pro se*, the ALJ gave her the opportunity to postpone the hearing to obtain counsel. (Tr. 67-68.) Specifically, the ALJ stated that, without an attorney, "you're gonna be hurting his case" and then gave Ms. Santiago pointers for finding an <u>effective</u> representative, including someone who is inquisitive and will track down records. (Tr. 68-70.) The ALJ obtained the names of Orlando's providers and stated he would attempt to collect records in the meantime. (Tr. 70-75.) The hearing was postponed for three months, and the ALJ cautioned: "Now, if we return in about three months' time, and you still don't have a representative, with or without, we're going forward." (Tr. 75-76.) The hearing was rescheduled for January 14, 2019. (Tr. 168.)

Prior to the second hearing, Ms. Santiago requested postponement again. First, on January 2, 2019, due to her inability to obtain counsel. (Tr. 148.) (The

hearing was rescheduled to April 2, 2019.  (Tr. 169.))  Second, on March 29, 2019, again due to her "poor luck obtaining counsel."  (Tr. 150.)

The second hearing went forward on May 2, 2019.  (Tr. 38, 204.)  The ALJ explained that the purpose of the hearing was to assess whether Orlando's still qualified for a disability, based on his previous disability determination and new evidence in the record.  (Tr. 38-62.)  Orlando and Ms. Santiago both attended and testified.  (*Id.*)  When the ALJ asked whether Ms. Santiago had a representative, she said she did not, explaining, "Everybody was sending me to somebody else."  (Tr. 39.)  With respect to the medical record, Ms. Santiago explained that she tried to look through it but "there's like a lotta stuff not in there."  (Tr. 41.)  The ALJ verified he would seek additional records, and Ms. Santiago recommended obtaining records from the following treatment providers: ComKey; Christalee Moore, Orlando's behavioral health therapist; "Ms. R. Tamu," Orlando's in-home speech therapist; Yale Pediatric Neurology; and Fair Haven. (Tr. 56-60.)

The ALJ issued his decision on September 26, 2019.  (Tr. 12-27.)  In relevant part, the ALJ made the following findings of facts and conclusions of law.  First, Orlando's initial disability determination—also known as the "comparison point decision," was made August 15, 2005, and his impairments were GERD, Nissen G-tube, and Laryngomalacia.  (Tr. 18-19.)  Second, Orlando's disability medically improved as of August 18, 2016. (Tr. 19.)  Third, as of August 18, 2016, Orlando has the following <u>severe</u> impairments: Chronic Lung Disease and ADHD.  (*Id.*)  Fourth, while these impairments are severe, they do not meet or medical equal any listed impairment in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("Listed Impairments").

(*Id.*)  Fifth, the impairments do not functionally equal any Listed Impairment.  (*Id.*) The ALJ broke this finding into six domains:

1) <u>Acquiring and using information</u> – less than marked limitation, because of his presentation of normal thought/organization, IQ of 97, and average test scores (notwithstanding some poor grades);

2) <u>Attending and completing tasks:</u> less than marked limitation, because, while Orlando's "educational records show noted problems with not getting work done and coming to class unprepared," (Tr. 23)—he demonstrated a normal ability to complete thoughts, has not repeated a grade, the school has not ordered an outside evaluation, and he likes to read and play video games;

3) <u>Interacting and relating with others:</u>  no limitation, because he gets along well with others, does not receive a "significant accommodation" for this domain, and shows an age-appropriate ability to socialize and communicate;

4) <u>Moving about and manipulating objects:</u> no limitation, because he does not have significant musculoskeletal abnormalities and his mother did not report any fine or gross motor limitation;

5) <u>Caring for yourself:</u> no limitation, because he does not have a "significant accommodation" for this domain and the educational records show age-appropriate abilities; and

6) <u>Health and physical well-being:</u> less than marked limitation, because his "well child exam" shows routine findings and "there are no showings for frequent need for treatment or therapy, periodic exacerbations, or intensive medical care as a result of being medically fragile."

(Tr. 21-27.) Because Orlando did not have a "marked limitation" in two or more domains, the ALJ concluded he was not "disabled" as of August 18, 2016. (Tr. 27.)

In addition to making these findings, the ALJ also evaluated the credibility of the witnesses. The ALJ summarized Orlando's and his mother's testimony as follows:

> [T]he claimant alleged that he gets distracted and is usually not able to complete tasks. He reported that reading is his strongest subject and math is his weakness. He stated that he has never had to repeat a grade and likes to read, play video games, and hang out with friends.
>
> The claimant's mother reported that he has ADHD, adjustment disorder, and slowed processing. She stated that he has terrible grades and does not communicate. She indicated his breathing function is low and he cannot blow out candles or scream. She reported his most recent hospitalization for breathing issues was 4 years ago.

(Tr. 20.) The ALJ concluded Orlando's "medically determinable impairments could reasonably be expected to produce the alleged symptoms." (*Id.*) But the ALJ caveated that "the statements concerning the intensity, persistence and limiting effects of the claimant's symptoms are not credible for the period since August 18, 2016, to the extent they are inconsistent with finding that the claimant does not have an impairment or combination of impairments that functionally equals the listings." (*Id.*)

The ALJ next assessed the reliability of the medical providers and examinations. With respect to letters provided by two treating providers Adria Doubleday-Stern, Ph.D. and Kathryn McVicar, M.D., the ALJ stated: "These letters do not provide any functional limitations. They have little probative value as to the claimant's functioning, and they do not even qualify as opinion evidence." (Tr. 21.) The ALJ provided no other explanation and did not cite objective evidence to

support his conclusion.  While the objective medical evidence contains more than 1,800 pages, the record does not include any other treating source opinions.

The ALJ assigned "some weight" to consultative examiner Maysa Akbar, Ph.D. (who met Orlando once) because Orlando's medical records showed more limitation than her findings expressed.  (*Id.*)  Lastly, the ALJ assigned "little weight" to state agency assessments due to the findings that Orlando had "no severe impairments." (*Id.*)

The record does not include treatment records of providers Orlando's mother testified about during the hearing and asked the ALJ to obtain.  Those include treatment records of Christalee Moore, Orlando's behavioral health therapist and "Ms. R. Tamu," Orlando's in-home speech therapist.  (Tr. 57-58.)

Ms. Santiago timely requested review of the ALJ's decision on November 5, 2019.  (Tr. 207-209.)  The Appeals Council upheld the ALJ's decision on July 23, 2020. (Tr. 1-6.)  Ms. Santiago filed the instant action on September 22, 2020.  (*See* Dkt. 1, Compl.).)

II.   STANDARD OF REVIEW

Under the Social Security Act ("SSA"), a minor child may be entitled to benefits if the child has a disability.  The SSA defines "disability" as a "medically determinable physical or mental impairment" resulting in "marked and severe functional limitations" that, at a minimum, "can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 1382c(a)(3)(C)(i).

An ALJ must complete three steps to determine whether a child is "disabled" under the SSA.

1. Determine whether the child can do "substantial gainful activity," including work. 20 C.F.R. § 416.924(a), (b). If the answer is "yes," the child is not "disabled" under the SSA. If the answer is "no," proceed to the next step. *See id.*

2. Determine whether the child's impairment or combination of impairments are "severe." 20 C.F.R. § 416.924(a)(c). Only a child with a "severe" impairment(s) can proceed to the third step. *See id.*

3. Determine whether the child's "severe" impairments "meet, medically equal, or functionally equal the listings" under Appendix 1, of 20 C.F.R. Part 404, Subpart P. 20 C.F.R. § 416.924(a)(d).

When the third step involves the "functionally equal" inquiry, the ALJ must evaluate the limitations of each impairment on six domains of functioning. These domains are: "(i) Acquiring and using information; (ii) Attending and completing tasks; (iii) Interacting and relating with others; (iv) Moving about and manipulating objects; (v) Caring for yourself; and (vi) Health and physical well-being." 20 C.F.R. § 416.926a(b)(1). For a "disabled" determination, one of the child's impairments must either pose an "extreme limitation" in one domain or a "marked limitation" in two or more domains. These determinations are made by comparing the child's functioning to other children who do not have impairments. 20 C.F.R § 416.926a(b)(2). It is the claimant's burden to prove all three Steps. [2]

---

[2] For adult cases, which are evaluated under a five-Step standard, the claimant bears the burden of proof at all stages except the final one, in which the Code of Federal Regulations clearly states: "In order to support a finding that you are not disabled at this fifth step of the sequential evaluation process, <u>we are responsible for providing evidence</u> that demonstrates that other work exists in significant

11

An ALJ has an affirmative obligation to develop the claimant's medical history, and when the claimant is *pro se* this duty is heightened. *See Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017) (citing *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999)). The ALJ must make "every reasonable effort" to help the claimant get medical records. *See* 20 C.F.R. § 416.912(b); *Will o/b/o C.M.K. v. Comm'r of Soc. Sec.*, 366 F. Supp. 3d 419, 425 (W.D.N.Y. 2019). The Code of Federal Regulations specifies that "every reasonable effort" means "an initial request for evidence from your medical source or entity that maintains your medical source's evidence" and "one follow-up request" between 10 and 20 calendar days after the first request. 20 C.F.R. § 416.912(b)(1)(i).

Once the record is sufficiently developed, it is the ALJ's role to "resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). The ALJ will also consider information provided by parents of minors. *See* 20 C.F.R. § 416.926a(b), (e)(1). An ALJ must take testimony of pain and other limitations into account but need not do so without question—rather, the ALJ may

---

numbers in the national economy that you can do, given your residual functional capacity and vocational factors. We are not responsible for providing additional evidence about your residual functional capacity because we will use the same residual functional capacity assessment that we used to determine if you can do your past relevant work." 20 C.F.R. § 404.1560(c)(2) (emphases added); *see Burgess v. Astrue*, 537 F.3d 117, 128 (2d Cir. 2008) (implementing the burden of proof). Although the Second Circuit has not explained the burden of proof for minor cases, the corollary three-Step standard for child cases does not put the onus on the Commissioner at any stage, as it does for Step Five under § 404.1560(c)(2). *See* 20 C.F.R. § 416.924(a). This Court therefore concludes the burden of proof remains with the claimant throughout the entirety of the case.

compare the testimony to other evidence in the record. *See Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010).

When an ALJ makes a finding that the child is not "disabled" and the Commissioner of Social Security upholds the decision, the child has the opportunity to appeal for the district court's judicial review. *See* 42 U.S.C. § 405(g). The district court may not make a *de novo* determination of whether a plaintiff is disabled in reviewing a denial of disability benefits. *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 860 (2d Cir. 1990). Rather, the court's function is to ascertain whether the Commissioner applied the correct legal principles in reaching his/her conclusion, and whether the decision is supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019) ("On judicial review, an ALJ's factual findings . . . 'shall be conclusive' if supported by 'substantial evidence.'") (quoting 42 U.S.C. § 405(g)). Therefore, absent legal error, this Court may not set aside the decision of the Commissioner if it is supported by substantial evidence. *See Genier v. Astrue*, 606 F.3d at 49. Further, if the Commissioner's decision is supported by substantial evidence, that decision will be sustained, even where there may also be substantial evidence to support the plaintiff's contrary position. *Id.*

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Lamay v. Astrue*, 562 F.3d 503, 507 (2d Cir. 2009) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Biestek*, 139 S. Ct. at 1154 ("[W]hatever the meaning of 'substantial' in other contexts, the threshold for such

evidentiary sufficiency is not high."). The substantial evidence standard is "a very deferential standard of review—even more so than the 'clearly erroneous' standard," and the Commissioner's findings of fact must be upheld unless "a reasonable factfinder would *have to conclude otherwise*." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (citations omitted). "[A district court] must 'consider the whole record, examining the evidence from both sides, because an analysis of the substantiality of the evidence must also include that which detracts from its weight.'" *Petrie v. Astrue*, 412 F. App'x 401, 403–04 (2d Cir. 2011) (quoting *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988)).

### III.  DISCUSSION

The parties do not dispute the ALJ's findings at Step One or Two. Plaintiff argues the ALJ's decision at Step Three should be reversed for two main reasons. First, the ALJ did not properly develop the record. Second, the ALJ's reversibly erred in finding that Plaintiff's impairment does not functionally equal the severity of a Listed Impairment. Defendant opposes both arguments.

#### A.  The Completeness of the Record

On behalf of Orlando, Ms. Santiago claims the ALJ failed to properly develop the record because the ALJ did not obtain medical opinion evidence from critical treatment providers. (*See* Dkt. 19 (Mot. Reverse) at 7-12.) According to Ms. Santiago, the missing medical information includes Clifford Beers, which treated Orlando for mental and behavioral health since 2016; Dr. Dilice Robertson to whom Orlando was referred for an autism evaluation on or about March 4, 2018, (Tr. 1467);

14

New Haven Public Schools, which possessed medical records but did not provide them because only educational records were requested; Integrated Wellness, which treated Orlando for behavioral health since May 2017; and ComKey, which provided in-home services for occupational therapy, physical therapy, and speech therapy.[3]  (*Id.* at 9.)  Ms. Santiago also argues that the ALJ failed to obtain any medical opinions from treating providers and inappropriately made his own determinations based on his review of the record.  All of these errors, Ms. Santiago argues, denied Orlando of his right to a full and fair hearing.  [

The Commissioner disagrees.  Specifically, the Commissioner states there are no "obvious gaps" in the record.  (Dkt. 24 (Mot. Affirm) at 9-15.)  The Commissioner states that the ALJ requested records, and received some, from Clifford Beers, Dr. Robertson, New Haven Public Schools, and Integrated Wellness.  (*Id.*)  While the Commissioner acknowledges the ALJ never sought records from ComKey, it posits that Orlando failed to show why these records were necessary to make an adequate finding.  (*Id.*)  The Commissioner instead argues that "the record contains occupational and physical therapy records, and the ALJ properly noted that the child attended physical therapy and made excellent progress with

---

[3] The medical records do not indicate that Dr. Robertson ever evaluated Orlando. Ms. Santiago testified that Dr. Robertson prescribes Orlando medication. (Tr. 73.) Claimant's counsel only states that Orlando was <u>referred</u> to Dr. Robertson, (*see* Dkt. 19 at 9), so the record remains unclear as to whether Dr. Robertson ever evaluated Orlando.  As for the New Haven Public School medical records, the school is not Orlando's medical provider and so the records should have, and likely were, accessed directly from the treating source, making the school's medical records redundant.  It is also unclear whether the school was prohibited from sharing Orlando's medical records with the ALJ.

improved endurance" and considered educational records with occupational therapy records and reports. (*Id.*)

With respect to opinion evidence, the Commissioner contends the record was sufficiently developed. The Commissioner notes the record contains two state agency assessor opinions and the opinion of a consultative examiner, Dr. Akbar, who was assigned "some weight." (*Id.*)

The Court finds that—even though the ALJ took reasonable efforts for some providers—he failed to take reasonable efforts to obtain medical records from other providers who are key to this case. Given the facts of this case, this failure is reversible error. *See Guillen*, 697 F. App'x at 108. Ms. Santiago specifically requested the ALJ obtain records from ComKey; Christalee Moore, Orlando's behavioral health therapist; and "Ms. R. Tamu," Orlando's in-home speech therapist. (Tr. 57-58.) But the evidence does not indicate the ALJ made medical requests for any of them. (*Id.*) ComKey provided ongoing occupational, speech, and physical therapies for Orlando in his home. (Tr. 58; Dkt. 19 at 11.) Mses. Moore and Tamu both provided ongoing care in their respective specialties. Such records are highly relevant to the "functional equivalence" analysis at Step Three and could have caused the ALJ to determine Orlando suffered from "marked limitations" in two or more domains.

For example, the occupational therapist who evaluated Orlando for his 2016 IEP reevaluation recommended that he continue treatment, even though he was exited from his IEP. (Tr. 312.) The occupational therapist noted concerns with his copying skills, bilateral skills, ability to stay seated upright for long periods of time,

16

and motor planning—all related to his ADHD. (*Id*.) His subsequent ongoing occupational therapy treatment for ADHD, which he received in-home through ComKey, would have informed the ALJ's determination of whether Orlando had significant difficulty acquiring and using information. Without relevant input from those treaters, the ALJ's determination that Orlando's IQ of 97, advanced reading level and basic math level, and academic progress in math weighed in favor of only having "less than marked limitation" for the domain of "acquiring and using information" is subject to question. (Tr. 21-22.)

The ALJ similarly found that Orlando had "no limitation" in the "moving about and manipulating objects" domain. Yet the medical evidence shows that Orlando required in-home, ongoing occupational, behavioral and speech therapy, and the missing records from these providers could provide critical information necessary to fully evaluate the significance of Orlando's testing achievements.

What is more, there appears to be other medical records that were not sought even though such referrals and treatment were explicitly referenced in the record. (*See, e.g.,* Tr. 1498 (referencing treatment with K-Assist Behavioral, from which medical records were not sought; Tr. 53 (testimony from mother about ongoing cystic fibrosis testing).)

An ALJ cannot make a sustainable determination "based on a medical record he [knows is] incomplete." *Will*, 366 F. Supp. 3d 419, 427 (W.D.N.Y. 2019). The unexcused absence of these records render the record incomplete.

In addition to raw medical data, it appears the ALJ failed to obtain <u>any medical opinions</u> from treating providers. Medical opinions "reflect judgments

about the nature and severity of [the claimant's] impairment(s), including ... symptoms, diagnosis and prognosis, what [the claimant] can do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 416.927(a)(1). A treating source includes a "medical source who provides … or has provided [the claimant] with medical treatment or evaluation, and who has, or has had, an ongoing treatment relationship" with the claimant. 20 C.F.R. § 416.927(a)(2). Medical opinions from treating sources are given more weight "since these sources are likely to be medical professionals most able to provide a detailed, longitudinal picture of [the claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations." 20 C.F.R. § 416.927(c)(2). A court cannot rely solely on raw data from the treating source. *See Dennis v. Colvin*, 195 F. Supp. 3d 469, 474 (W.D.N.Y. 2016). "What is valuable about the perspective of the treating physician—what distinguishes [her] from the examining physician and from the ALJ—is [her] opportunity to develop an informed *opinion* as to the physical status of a patient." *Id.*

Courts have held that a determination made without any treating source opinion or after rejecting a treating source opinion is reversible error. *See, e.g., Will*, 366 F. Supp. 3d at 427 ("[T]he ALJ's explanation for the weight afforded to NP Ross's opinion is insufficient and appears to be a substitution of the ALJ's judgment for that of NP Ross who, although not a medical doctor, has greater training and expertise in the area of mental health than does the ALJ."); *Dennis*,

195 F. Supp. 3d at 474 (rejecting ALJ's assessment of residual functional capacity in adult case "because there was no medical opinion relating the medical information to a specific RFC"); *Didio v. Berryhill*, No. 3:18-cv-01536 (SRU), 2019 WL 1352807 (D. Conn. Mar. 26, 2019) (finding reversible error when ALJ rejected treating source opinions in favor of consultative physicians without providing sufficient explanation). The Court is troubled by the fact that there are no treating source opinions despite the fact that two treating sources—Drs. Doubleday-Stern and McVar—produced letters in which they expressed their willingness to provide more information concerning their ongoing treatment of Orlando's adjustment disorder with depressed mood and ADHD, respectively. (Tr. 665-67.) Both letters were submitted well before the ALJ's hearings, and their medical opinions could have been procured. (*See id.*) In addition, the ALJ also could have obtained treating source opinions from other providers who submitted raw data.

The only medical opinions in the record are from non-treating examiners. Even for these sources, the ALJ gave "little weight" to two state agency assessments that failed Orlando at Step One and he gave "some weight" to a consultative examiner who did not have Orlando's full diagnoses. (*See* Tr. 21, 644.) All of these examinations were conducted in 2016, prior to the determination revoking Orlando's disability benefits and before Orlando could update his diagnoses. While the ALJ correctly chose not to rely heavily on these examinations, without any treating source opinions the Court finds the ALJ impermissibly made a judgment that was not supported by substantial available evidence.

For these above reasons, the case must be remanded for further development of the record, including medical opinions from treating sources. The Court notes that, because Orlando is now represented by counsel, the ALJ's duty to develop the record is diminished but not eliminated.

### B. Six Domains of "Functional Equivalency"

Because the Court is remanding this case for further development of the record, it will not address the ALJ's findings for each of the six domains as such a premature "analysis" would be speculative at best.

## IV.   CONCLUSION

The Court finds that the ALJ did not properly developed the record. For the following reasons, the Court REMANDS the case for further development of the record consistent with the above decision.

Vanessa L. Bryant
United States District Judge

SO ORDERED at Hartford, Connecticut this 11th day of March, 2022.